## HOWELL *et al.* *v.* KINNEY *et al.*

1. While the determination by an ordinary, or board of county commissioners, in proceedings to change militia district lines, cannot be directly reviewed by *certiorari* or otherwise, it is within the power of the superior court, or of this court, if such proceedings, or the final action taken therein, be for any reason void, to so declare, when the question of their validity is properly presented for adjudication.

2. A petition for a change in the line between two militia districts should distinctly specify the location of the new line desired, and the commissioners appointed under section 484 of the code should, if they deem such change necessary and expedient, "lay out and define" the new line, and in their report so describe the same that its location may be readily ascertained.

3. The law does not contemplate that in proceedings to change a line between two militia districts, an isolated portion of the territory of one of them, not contiguous to the other, should be transferred to the latter; nor that, as a result of a given change in lines, two portions of a district should be left entirely segregated from each other.

4. Inasmuch as none of the alleged changes in the lines of the militia districts involved in this case were legally made, and

the petitioners' right to an injunction necessarily depended upon the validity of such changes, it was error to grant the injunction.

November 2, 1896.   Argued at the last term.

Injunction.   Before   Judge   Janes.   Floyd   county.
May 14, 1896.

Seaborn Wright, for plaintiffs in error.
George A. H. Harris, contra.

LUMPKIN, Justice.

A number of citizens of Floyd county filed an equitable petition against certain justices of the peace of that county, and others.   The allegations of the petition now material may be briefly summarized as follows:   Petitioners are all farmers residing in the Ridge Valley district of the county named, the same being a "stock law" district, the land lines of which are lawful fences.   All of their farms are in that part of the district which lies west of the Oostanaula river. The defendants have entered into a conspiracy to harass and annoy the plaintiffs, and deprive them of the benefits of the stock law.   Under the advice of the defendant Seaborn Wright, an attorney at law, the defendants who own cattle, or other live stock, are to turn their animals out, and allow them to trespass upon the plaintiffs' farms; and whenever one of the plaintiffs impounds stock trespassing upon his crops, the conspirator to whom such stock belongs is to go before one of the justices of the peace above referred to and sue out a possessory warrant.   The cases thus originating are to be tried in districts other than those in which petitioners reside, thus subjecting them to great expense, annoyance and delay; and the scheme of the conspiracy contemplates that these justices of the peace— who are parties to the conspiracy—will invariably award the possession of the stock in controversy to their coconspirators, the plaintiffs in the possessory warrants.   The petition then proceeds to enumerate various alleged griev-

35

ances originating in the unlawful conduct of the defend-
ants; and prays that the justices of the peace named there-
in be enjoined from issuing and trying any more posses-
sory warrants against the petitioners for stock impounded
by them; that Seaborn Wright be enjoined from further
advising or taking part in or prosecuting such warrants;
that certain named defendants, alleged to be insolvent, be
enjoined from allowing their stock to run at large upon
any of the farms of petitioners, and that all the other de-
fendants be enjoined from suing out such warrants against
petitioners before any justices of the peace of the county.

At the hearing the judge passed an order enjoining the
magistrates named in the petition from issuing or trying
any possessory warrants against the petitioners to recover
stock legally impounded in that part of Ridge Valley dis-
trict west of the Oostanaula river—"the holding of the
court being that all territory added to the said Ridge Val-
ley district by order heretofore granted by the Commis-
sioners of Roads and Revenues of Floyd Co., which is
described by number of lot, by metes and bounds, or
in any other way whereby the boundary line may be traced
or made certain, became and is now a part of the Ridge
Valley district, and subject to stock law." All the other
defendants were enjoined from suing out possessory war-
rants to recover stock impounded "in the above described
territory." The defendants affected by the injunction
bring the case here for review.

If the petitioners had proved all the material allegations
of their petition, the case would have presented for adjudi-
cation a number of difficult and important questions; but,
in our judgment, the plaintiffs failed to establish the car-
dinal fact upon which all their alleged rights in the prem-
ises depend, viz: that their farms are in fact situated in the
Ridge Valley district. It may be assumed that this dis-
trict, as originally laid out, was lawfully under the opera-
tion of the "stock law," and consequently, if the plaintiffs'

farms are within its boundaries they are entitled to all the benefits and protection which that law affords. If, on the other hand, their farms are not in this district, their entire case falls to the ground. It clearly appears from the record that none of these farms were originally embraced in the Ridge Valley district, but petitioners claim that their lands have been added to the territory of that district by reason of certain alleged changes in the militia district lines. They offered evidence as to proceedings had by the board of commissioners of roads and revenue of Floyd county under which they assert the changes in question were effected. We will presently state, in a general way, the nature of these proceedings, and endeavor to show that they were absolutely void, and therefore utterly ineffectual. Before doing so, we will, however, briefly notice a preliminary question presented by the record.

1. It has frequently been held by this court that the determination by an ordinary, or board of county commissioners, in proceedings to change militia district lines cannot be directly reviewed by *certiorari* or otherwise. While we are not in the least degree disposed to call in question the correctness of this proposition, we are at the same time quite sure that it is within the power of the superior court, or of this court, to declare such proceedings and the final action taken therein absolutely void whenever it becomes apparent that there was no law authorizing the same, or is manifest that no attempt was made to conduct them in conformity with valid existing regulations governing such proceedings, or that the action taken was in utter disregard thereof. For instance, if an ordinary or county board, acting upon a private letter signed by an individual, should peremptorily issue a proclamation declaring that a designated change was thereby made in the lines of two militia districts, no one would for a moment contend that the proclamation amounted to anything. Again, if, upon proceedings entirely lawful and regular

down to the time when the final action was to be had, an order should be passed undertaking to define a change in district lines, and which described the new line so imperfectly that its location could not by any possibility be ascertained, it is obvious that the order would be a mere nullity. These illustrations might be multiplied indefinitely, but those given will suffice to indicate the distinction to be drawn between that class of cases which merely involve the question whether or not the discretion vested in the county authorities designated by law to deal with the matter has been wisely and judiciously exercised, and such cases as collaterally present the question whether the action taken by the county authorities in a given proceeding of this kind can properly be deemed to have any legal effect, when the same is so indefinite or repugnant to the provisions of law upon which it was based that it could in no event have any lawful or practical operation.

2. Various persons owning lands lying outside of the Ridge Valley district filed petitions, addressed to the board of commissioners of roads and revenue of Floyd county, praying that the lines of the districts in which their farms were respectively situated be so changed as to place their lands within the Ridge Valley district. Quite a number of these petitions were presented, each being filed in behalf of two or more persons. Not one of these petitions, however, undertook to define the location of the militia district lines as then existing, nor attempted to set forth and describe the precise change or changes sought to be made therein, so as to even vaguely indicate what would be the location of the new lines desired. The petitioners merely prayed, in a loose and general way, that their farms, then lying in specified districts, "be changed or cut off into Ridge Valley." Nor, in many of the petitions, were the lands thus to be affected otherwise described than by giving the numbers of the land lots by which they were origi-

nally known, or by designating them as being "parts" of such land lots; and, in some instances, a particular parcel of land was merely referred to as being that part of a specified lot which lay in a given direction from a certain named road. Indeed, in some of the petitions, the lands were not otherwise described than as being the "farms" of the persons therein named as petitioners. In a few cases, attempts were made to describe some of the lands by giving metes and bounds, and the general courses and directions of their boundaries; but in every such instance, other lands also included in the proposed change were described simply as comprising certain land lots, or parts of the same, without any further attempt at particularity. Suffice it to say that, upon a careful examination and review of each of the petitions brought up in the record, we have not found a single one which undertakes to distinctly and accurately describe the lines around the territory sought to be transferred to the Ridge Valley district, or to set forth *data* or information sufficient to enable a surveyor to properly locate and lay out the new militia district lines which would result from the proposed change.

Nevertheless, the county board entertained these several petitions, and in each instance passed an order appointing certain persons to act as commissioners, directing them, in substance, to go upon the premises described in the petition, view the proposed change as indicated, and, if they found it necessary and expedient, to then proceed "to mark it out," and make their report to the board at a time designated. Most, if not all, of the reports made by the commissioners thus appointed were in substantially the following language: "In obedience to the above order, we went upon the premises and viewed the proposed change as indicated, and find the change necessary and expedient, and therefore respectfully recommend that the petition be granted." These reports were followed by orders granted by the

county board, the substance of which was: "After hearing the foregoing petition, and the report of the reviewers thereon, it is ordered that the same be granted as prayed for." There were, indeed, some slight variations in the wording of the several reports and orders just referred to, but none of sufficient importance to change their general character, or to require special notice in dealing with the same. The above summary presents, on the whole, a fair statement of the nature of the proceedings upon which the plaintiffs below relied to establish their contention that their respective farms had been legally transferred into the Ridge Valley district.

In our judgment, these proceedings were so fatally defective as to amount to nothing more than absolute nullities. The imperfections of the petitions have already been sufficiently, though briefly, pointed out. They were altogether too vague, uncertain and indefinite to form a basis for any of the subsequent proceedings taken in regard to changing district lines; and therefore there was in each instance, at the very outset, an insuperable legal obstacle to any valid action being taken in the premises. Sections 484, 485 and 486, of the code provide: "Whenever it may be necessary and expedient to lay out a new militia district, or to change the lines of old ones, the ordinary may, at any time, appoint three commissioners, citizens of the district or districts from which it is proposed to make the new district, or change the lines thereof, whose duty it shall be to lay out and define such lines, and report the same to said ordinary." "Such commissioners have authority to engage the services of a competent surveyor to assist them in their duties, who shall be paid for his services, out of the county treasury, the same compensation county surveyors have for similar services rendered a citizen." "If the ordinary approves their report, he shall have all proceedings in the matter entered on his minutes,

after which the district laid out, or line changed or defined, shall be known and regarded accordingly."

The first of these sections manifestly contemplates that, in order to effect a change in the lines of militia districts, the new lines shall be laid out and defined; and therefore, a petition seeking such a change should describe the proposed new lines with at least sufficient particularity to enable the commissioners appointed by the ordinary, or county board, to locate the same, and, if they approve the change as necessary and expedient, to then proceed intelligently to lay out and define the course or courses along which such lines shall run.    This is precisely what these commissioners are required to do, and it is obvious that they cannot possibly perform their duty unless they are informed with reasonable certainty, either by the petition itself, or by the order appointing them, what effect upon existing district lines the proposed change would have, and where the new line or lines would run, in the event such change were made. It must be observed that the law authorizes changes to be made only when necessary and expedient, and imposes upon the commissioners the duty of reporting, in every instance, upon the question of necessity and expediency. It is not contemplated by the statute that the commissioners shall pass blindly upon a matter of so much public concern; but rather, that they shall not undertake to deal at all with the question, until fully possessed of such information as will enable them to exercise a sound judgment and discretion in arriving at their conclusion.    As above stated, it is their duty, not only to inform themselves of the exact location of the new lines which the proposed change will establish, but to *lay out and define* the same; and they are expressly authorized to engage the services of a competent surveyor to assist them in properly performing this essential requirement.    How can a surveyor possibly undertake to lay out and define the location and courses of

such lines upon the surface of the earth, in the absence of definite information as to the exact change to be made in the district lines as then existing? The question is answered in asking it.

Finally, when the commissioners have made their report, which ought to specify and describe as accurately as possible the new lines as laid out and defined by them, it becomes the duty of the ordinary, or other proper county tribunal, if the report of the commissioners be approved, to have all the proceedings in the matter entered on the minutes, after which the "line changed or defined shall be known and regarded accordingly." The evident purpose of this last requirement is to give notice to all concerned regarding the new boundaries established for the districts affected by the change thus sanctioned; and it is obvious that if the proceedings are so indefinite and unintelligible as to convey no adequate or satisfactory idea of the object they were designed to accomplish, a person looking to them for information would be perplexed rather than enlightened, and the purpose which the law has in view in directing such proceedings to be spread upon the minutes would be utterly defeated.

As has been seen, the petitions upon which these proceedings were based could afford to no one the means of ascertaining with any degree of certainty what effect they would, if granted, have upon militia district lines as then existing. The orders issued by the county board were equally indefinite and uncertain, for they merely directed the commissioners to view the proposed change *(as indicated respectively in each of the several petitions),* and, if found necessary and expedient, to proceed to mark "it" out. Even if the word "it" refers, as presumably was intended, to a change in the district lines, no intelligible direction was given to the commissioners; for the petitions to which they were referred for information concerning

the proposed changes upon which they were expected to report utterly failed to set forth sufficient *data* to enable them to intelligently pass upon the questions submitted for their determination. Nor does it appear from their reports that they even attempted, with or without the aid of a surveyor, to perform the duty imposed upon them by law of locating, laying out and defining the courses which the new district lines would take in the event the proposed changes in existing lines were made. Indeed, their reports are as vague as the petitions, and as general and indefinite as the orders appointing them and directing them as to how they should proceed. They filed with their reports no plats or diagrams, nor did they otherwise attempt to describe the location of existing lines, specify the nature and extent of the changes sought to be made therein, or convey the slightest idea of the courses over which the new lines would run if established in accordance with their reports. In no instance did the report made by the commissioners amount to more than a mere off-hand recommendation, couched in the most general terms, that "the petition be granted." The final orders passed by the county board, approving and adopting the reports of the commissioners, were as vague and indefinite as all the preceding steps which had in each instance been taken. Granting that all these proceedings were duly entered on the minutes, the record of them could afford to an enquirer only the most meagre and unsatisfactory information as to what was sought to be accomplished, or what action was really taken in the premises, or what was its precise effect. From this record, it would be a matter of the greatest difficulty, if not absolutely impossible, to ascertain in what particular militia district scores of persons in Floyd county now reside. If, as matter of fact, any of the commissioners attempted to lay out and define a single militia district line agreeably to law, the record of the proceedings would give no hint in

regard thereto, much less furnish the means of definitely ascertaining the location of such line, its general course or direction.

We are therefore confidently of the opinion that none of the proceedings in question can properly be regarded as having any valid lawful operation, force or effect. It results, as a necessary consequence, that the plaintiffs below signally failed to establish their contention that their respective farms had been regularly and legally transferred into the Ridge Valley district. This being so, they have no foundation upon which to rest their case.

3. Although what is said above virtually disposes of the case, we think it proper to refer briefly to one or two special matters which the record before us brings into question.

If the proceedings above referred to were to be treated as having the effect, as contended by plaintiffs, of transferring to the Ridge Valley district the numerous tracts of land embraced in the several petitions presented to the board of county commissioners, two anomalous results would follow. The first of these is, that in some instances an isolated portion of the territory of a district other than the Ridge Valley district would be added to the latter, although in point of fact such territory nowhere touched, or was contiguous to, any portion of the Ridge Valley district. The second is, that it would in one instance have happened that two portions of a district other than the Ridge Valley district would be left entirely segregated from each other. We feel certain that the law authorizing changes to be made in militia district lines never contemplated such gerrymandering as this. As demonstrating the correctness of this proposition, we content ourselves with presenting a diagram which illustrates the situation, and is of itself sufficiently convincing to need no argument in its support.

The small squares, A., B. and C., represent isolated tracts of land lying in a district remote from the Ridge Valley district, which it is claimed were transferred to the latter district.

ROME DISTRICT.

R.

RIDGE VALLEY DISTRICT.

ROME DISTRICT.

The shaded space marked R., constituting a part of the Rome district, represents territory sought to be transferred to the Ridge Valley district, leaving the two remaining portions of the Rome district entirely segregated.

4. If we have taken the correct view as to the legal effect of the proceedings instituted for the purpose of making changes in existing militia district lines, it is quite clear that the trial judge erred in granting the injunction.

*Judgment reversed.*