HILLSMAN *et al. v.* HARRIS *et al.*

1. It would seem that the action of the ordinary in changing district
   lines is final and not subject to review by writ of *certiorari* or other-
   wise. The district lines mark the territorial divisions of the
   county, and the power of establishing and changing them is in its
   nature political or legislative rather than judicial.
2. But granting the power of review, the opinion of the superior
   court should not be substituted for that of the ordinary save in
   cases of fraud or of gross abuse of discretion.
3. Whether enlarging the territory of a district to which the stock
   law has been applied by popular election would "fence" the added
   territory or not, is not now for decision.
   February 24, 1890.

Militia districts. Practice. Counties. Ordinary.
Before Judge SMITH. Marion superior court. April
term, 1889.

The petition of Hillsman and others to the ordinary
alleged that they were citizens and property-owners of
948th district G. M., or Brantley district, of Marion
county, and deemed it necessary and expedient to

change the lines between that district and the 710th district G. M., or Pineville district; setting forth the change of line desired and describing the territory to be taken from the 948th and added to the 710th district, and alleging that the change was expedient and necessary, because: (1) The portion of the territory to be taken from the 948th and added to the 710th district is almost timberless, and the 710th district has of force in it the "stock law." (2) The parties to be affected by the change are willing and anxious for it, as will appear by their written petition attached. (3) If the change should be made, there would still be in the 948th district a sufficient number of residents to form a captain's company under the militia laws of this State.

Attached to the petition was a diagram showing the proposed change, and a consent in writing to the change, with signatures of fourteen persons including petitioners. The ordinary appointed three of the petitioners as commissioners to lay out and define the line, directing them to report by the first Tuesday in February, 1889. They did report, defining the line as prayed for.

Harris and sixty others, as citizens of the 948th district, filed a counter-petition, asking that the change be refused, for the reasons that it is neither expedient nor necessary as the law contemplates; that the benefits to be gained to those desiring the change by no means counterbalance the very great loss and heavy damage to be incurred by those who would be "liners" were such a change made, those to be damaged far outnumbering those to be benefited; and that the change would cut off so much of the 948th district as not to leave in it a captain's company as required by law. They also demurred to the petition, on the following grounds: (1) The facts set out fail to show that it is necessary and expedient to make the change; the de-

sire of the applicants to be cut off into the 710th district, because their lands are timberless and because the stock law is of force there, is not of sufficient necessity and expediency to the public to authorize the change, though it might be to the private interest of the applicants. (2) Because the proposed change so disfigures the 948th district, in running in so zigzag a manner and leaving a narrow strip of that district from $\frac{1}{2}$ to $1\frac{1}{2}$ miles wide and four miles in length on the Chattahoochee county line, as to show that it is not necessary and expedient to make the change. (3) If the change is made, it will discommode and inconvenience as many or more of the neighbors of applicants, by placing them in the category of which applicants complain. This demurrer was overruled.

On the trial, Hillsman testified for the applicants : He and all the parties reside within the territory desired to be cut off from the 948th district and added to the 710th. Applicants are, with one exception, all the parties who reside within that territory. It is necessary and expedient to make the change, because the territory desired to be cut off is timberless, is in the extreme southwest corner of the 948th district, and the voters in that territory would have to go but from two to two and a half miles further to reach the precinct after the change than before. The territory to be changed is about four or five miles across. The diagram attached to the petition is correct, and shows the proposed line. He has seen all the parties in the territory to be cut off and all but one were willing and anxious for the change. There is a fence along the proposed line that, with very little work, could be made a lawful fence. Several of those who signed the counter-petition live six or seven miles from the proposed line and some of them out of the district, and but few of those who signed it own either stock or land.

For the objectors three witnesses testified. One of them saw some of the parties sign the counter-petition and others told him to sign their names. About twenty-seven of the counter-petitioners would be either on the proposed line or within one and a half miles of it, seventeen being land-owners or stock-owners, and would be inconvenienced by the change, as they had no pastures built, and it was then the first of February and there was no time to build them. He did not know whether all the parties whose names were on the petition lived in the 948th district, but thought they did. There would be a strip of land between the Chattahoochee county line and the proposed line, from one to one and a half miles wide and about four or five miles long. All the parties who signed the counter-petition are opposed to the change. Another testified that all who signed the counter-petition lived in the 948th district and owned either stock or land. A large number of them would be either on the line or within one or two miles of it. Stock would range from two to three miles and get into the stock law district. He was verbally authorized to sign for some and saw others sign, but there were a great many names on the petition whom he did not see sign and for whom he was not authorized to sign. There were a great many in the 948th district who did not sign either petition. There would be over one hundred men left in the 948th district after the proposed territory was cut off, enough to form a captain's company.

The ordinary granted the application for the change. On this ruling with others made by the ordinary at the trial, error was assigned by *certiorari*, which was sustained; and the petitioners excepted.

CRAWFORD & McMICHAEL, by brief, for plaintiffs.
MILLER & BUTT, for defendants.

BLECKLEY, Chief Justice.

1. The code, §484, provides that whenever it may be necessary and expedient to change the lines of a militia district, the ordinary may appoint three commissioners whose duty it shall be to lay out and define such lines and report the same to the ordinary. Section 486 declares, " If the ordinary approves their report, he shall have all proceedings in the matter entered on his minutes, after which the . . line changed or defined shall be known and regarded accordingly." It would seem that the necessity and expediency of a proposed change are submitted by the law to the ordinary's judgment and discretion. So too is the final result after action by the commissioners,—" if the ordinary approves their report, he shall have all proceedings in the matter entered on his minutes, after which the . . line changed and defined shall be known and regarded accordingly." No provision is made for reviewing the ordinary's approval, or for having any trial or investigation upon which to predicate a review. The ordinary may appoint commissioners of his own motion. He is not required to wait for a petition ; and when there is a petition, there is no provision for answering or resisting it by other parties. In this respect the matter is somewhat like that dealt with in *Meadows* v. *Taylor*, 82 *Ga.* 738. The approval of the ordinary may be induced by anything that occurs to his own mind. He may act on his own personal opinion irrespective of any and all evidence. Indeed there is no provision for taking evidence or having any trial upon the question whatever. And the omission to furnish machinery for such a purpose was, we may suppose, not merely casual, but intentional. The work of changing the lines of militia districts is political rather than judicial in its nature, these districts being the political divisions of a county, and sustaining with reference to the county a relation somewhat like

that which the counties sustain to the State. We doubt, therefore, whether it is in the power of the superior court to substitute by judgment upon a *certiorari*, or otherwise, its opinion for that of the ordinary as to the necessary and expedient location of district lines.

2. But assuming that the power to revise the approval of the ordinary exists in such cases, we think there is no such manifest error in his approval in the present instance as would justify a reversal of his action. There is no suggestion of fraud or wilful abuse of discretion on the part of the ordinary; and without that or something equivalent to it, we think his official decision as to where the district line ought to be should control. He is a local officer elected by the people of his county, chosen for his fitness to decide such questions; and if the people are not satisfied with his administration, they will have an opportunity of dispensing with his services and substituting another in his place by popular election. His successor can restore the line to its former position if he shall deem it necessary and expedient to do so. As far as we can see, this is the only remedy, upon the facts in the record before us, for any mistake of judgment that may have been committed by changing the district line under consideration.

3. We are not to be understood as expressing any opinion as to whether a change of the district line will "fence" any of the territory not embraced in the district when the stock law was applied to it as the result of an election held for that purpose. That law as passed by the legislature (Code, §§1455a, 1455b) contemplated a system of interior and exterior fences, the interior being merely the land-lines, and the exterior actual, not ideal, fences. But because the means of constructing the exterior fences, viz. taxation of the district, was unconstitutional, that part of the scheme

failed. *Jones* v. *Sligh*, 75 *Ga.* 7. But this failure did not defeat the scheme altogether. *Dover* v. *The State*, 80 *Ga.* 781; *Holleman* v. *Kingery*, 81 *Ga.* 624. Whether a mere legal, ideal fence enclosing a district would be removed by change of the district line, which certainly would not effect removal of a physical fence, may be questioned. The statute provided for building a physical fence, but not for changing its location. Whether the ideal fence admits of change without a new election, is a question we need not now entertain, much less express any opinion of the yea or nay of.

But being satisfied that according to the law of the case, the establishment of the new line by the ordinary was authorized, and that his judgment as to where the line should be ought not to be interfered with, we think the superior court erred in sustaining the *certiorari.*                     *Judgment reversed.*