## AULTMAN *et al.* v. HODGE *et al.; et vice versa.*

1. The court did not err in overruling the general demurrer to the petition, which sought to have declared void the order of the board of commissioners of roads and revenues of Houston County, approving the action of the grand jury of that county, approving an application for a change in the county line between Houston and Macon Counties, on the ground that such order was void because no notice of the application had been posted in one of the militia districts of Houston County adjacent to the line sought to be changed. FISH, C. J., and ATKINSON, J., dissent.

2. There was no error in the rulings on special demurrers.

3. A nonsuit was properly granted. HILL and GILBERT, JJ., dissent.

    Nos. 1641, 1642. SEPTEMBER 2, 1920. REHEARING DENIED SEPTEMBER 20, 1920.

Equitable petition. Before Judge Gower. Houston superior court. August 5, 1919.

In December, 1916, certain citizens of Houston County filed with the ordinaries of Houston and Macon Counties a petition for a change of the county line between these counties, as prescribed in § 468 et seq. of the Political Code. At the April term, 1917, of the superior court of Houston County the matter was duly laid before the grand jury of that county, which presumably had before it, for consideration in determining whether the change

of the county line should be approved, the petition, all maps, plats, and other papers that may have been filed therewith in accordance with the statutory provisions on the subject; and in their general presentments at that term the grand jury recommended by a two-thirds vote that the change as prayed for be made. This recommendation was by the clerk of the superior court of that county certified to the board of commissioners of roads and revenues, having control of county business in that county, for their approval or disapproval. Before final action was taken by such board of commissioners, and within thirty days from the certification, certain citizens and taxpayers of Houston County filed a petition to enjoin the applicants from further urging or prosecuting their application for the change of the county line, and to enjoin the members of the Board of Commissioners of Roads and Revenues of Houston County from further consideration of the application for the change, and from taking any action towards the approval and certification of such change as recommended by the grand jury of Houston County. On an interlocutory hearing of the petition a temporary injunction was denied, and that ruling of the court was brought to this court for review. This court affirmed the judgment refusing an interlocutory injunction. *Aultman* v. *Hodge,* 147 *Ga.* 626 (95 S. E. 297). Upon the filing of the bill of exceptions to this court by petitioners the trial judge granted a supersedeas. The judgment of this court affirming the refusal to grant an interlocutory injunction was duly made the judgment of the superior court of Houston County, and the supersedeas theretofore granted was dissolved. Thereafter the Commissioners of Roads and Revenues of Houston County voted to approve the change in the county line between Houston and Macon Counties, as recommended by the grand jury, and an order promulgating the change was certified by the ordinary, advertised, and recorded in accordance with the statute. The grand jury of Macon County had previously recommended the change of the county line, and the Commissioners of Roads and Revenues of that county had previously acted approving the recommendation of the grand jury. At the April term, 1918, of the superior court of Houston County the injunction came on to be heard before a jury. The demurrers filed by the defendants to certain paragraphs of the petition were sustained; and the general demurrer and certain special demur-

rers to the petition were overruled. Both plaintiffs and defendants filed exceptions pendente lite to the judgment of the court on the demurrers. At that term the petitioners amended their petition by alleging that the Board of Commissioners of Roads and Revenues of Houston County had "made and entered an order approving the application for the change of the county line which is the subject-matter of this suit, and plaintiffs pray that said order be decreed to be null, void and of no effect." The ruling on the demurrers and the petition as amended left but one issue for the jury, that is, whether the notice required by the Political Code, § 468, was posted at three public places in one of the militia districts in Houston County adjacent to the line to be changed; it appearing from the allegations of the petition that notice of intention to apply for the change of the county line as required by the statute was published in a public gazette having general circulation in each of the Counties of Houston and Macon, and was posted at the door of the court-house in each of such counties, and in three public places in every militia district adjacent to the line to be changed, except the 528th district in Houston County. Evidence was submitted upon this issue, and at the conclusion of the evidence the court granted a nonsuit. Petitioners excepted, and the defendants filed a cross-bill of exceptions, assigning error upon their exceptions pendente lite.

*John R. L. Smith, Grady C. Harris, C. L. Shepard,* and *Feagin & Hancock,* for plaintiffs.

*R. L. Greer, Jule Felton, John B. Guerry, R. N. Holtzclaw, Duncan & Nunn,* and *C. E. Brunson,* for defendants.

GILBERT, J. The Civil Code (1910), § 468, provides what things are necessary and essential for the change of county lines, where a citizen or any number of citizens shall desire to have the boundary line of the county of his or their residence changed. Recognizing that a change of county line is of vital interest to citizens whose property may be affected, and to the taxpayers of the respective counties to be affected, the General Assembly provided for ample notice as a prerequisite to any action on such a change by the county authorities. The statute constituted at most a limited or qualified delegation of legislative authority. It was necessarily a limited or qualified delegation, because the constitution of the State explicitly provides that "the legislative power of

the State shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives." Civil Code (1910), § 6410. The general power to change the county line must be obtained from the General Assembly; but the General Assembly may act through other agencies, such as grand juries, county commissioners, local boards, and the like, who are to be guided by such general provisions, "to fill up the details." This rule has been fully recognized and discussed heretofore by this court. *Georgia R.* v. *Smith,* 70 *Ga.* 694; *Southern Ry. Co.* v. *Mellon,* 133 *Ga.* 277 (65 S. E. 665) ; *Richter* v. *Chatham County,* 146 *Ga.* 218 (2), 220 (91 S. E. 35). Where legislative authority is exercised through an agency deriving its power wholly from the General Assembly under definite and explicit rules and regulations, compliance with which is prerequisite and essential to the exercise of such delegated authority, no action whatever is valid and binding unless there is compliance with all of the conditions prescribed. When this case was before us on a former occasion it was said: "Where the provisions of the act [Acts 1880-81, p. 52, Civil Code (1910), §§ 468-471] have been fully complied with, the quantity of land that may be transferred from one county to another by a change of county line is limited only by the restrictions contained in the act; that is, by the discretion of those officials named in the act, and by the constitutional prohibitions against the removal of a county-site, or the dissolution of a county, except in the manner prescribed in article 11, section 1, paragraphs 4 and 5, of the constitution (Civil Code 1910, §§ 6597, 6598)." *Aultman* v. *Hodge,* 147 *Ga.* 626 (95 S. E. 297). The discretion which vests in the officials named in the act is limited to their right to decide for or against the change of boundary line after all conditions precedent have been fulfilled. A contrary construction of the act, giving to the local officials full powers such as pertain to the General Assembly, would result in an obvious conflict with the section of the constitution above mentioned, and found in the Civil Code, § 6410. It is our duty to give it a construction consistent with the constitution, if the language will so permit, (*Strickland* v. *State,* 137 *Ga.* 1, 11, 72 S. E. 260, 36 L. R. A. (N. S.) 115, Ann. Cas. 1913B, 323 ; 6 R. C. L. 78), and to impute to the General Assembly an intention to delegate only such power as the constitution of the State permits, and not otherwise. The

General Assembly of Georgia, in the matter of legislation, is un-limited, except by the constitution. When, therefore, it has passed an act and the same has been approved by the Governor, the courts will and do conclusively assume that there has been a compliance with all necessary prerequisites, such as publication of notice of intention to introduce local bills. *Clark* v. *Eve,* 134 *Ga.* 788 (3), 789 (68 S. E. 598), and authorities cited. This rule is based upon the same principle as that which applies to judgments of courts exercising general jurisdiction. The rule does not apply to boards, judicial bodies, or other agencies exercising limited or qualified legislative authority, where definite and specific require-ments are made prerequisite to the exercise of such delegated au-thority. This principle has been established by repeated rulings of this court. *Roberts* v. *Murphy,* 144 *Ga.* 177 (86 S. E. 545); *Dooly* v. *Fairmount,* 146 *Ga.* 689 (92 S. E. 209); *Hall* v. *Macon,* 147 *Ga.* 704 (95 S. E. 248); *Ray* v. *Swain,* 148 *Ga.* 203 (96 S. E. 209). Had the act placed the duty of giving notice upon public officers, a presumption that they had performed their duties in the matter would have arisen. This presumption would have been prima facie, but not conclusive, and evidence would have been ad-missible to show that notice had not been given as required by the statute. *Ray* v. *Swain,* supra. The act, however, does not place this duty upon any public officer. On the contrary it provides that "the person or persons applying for such change shall also give notice" in the manner therein provided. Civil Code, § 468. As authority for the proposition that the courts cannot go back of the action of the grand jury for the purpose of ascertaining whether or not the statutory requirements have been complied with, these cases are cited: *Hillsman* v. *Harris,* 84 *Ga.* 432 (11 S. E. 400); *Gas-Light Co.* v. *West,* 78 *Ga.* 318. The former was a proceeding instituted before the ordinary for the purpose of changing militia-district lines, and a counter-petition asking that the change be refused. The ordinary granted the application for the change, and error was assigned by certiorari. This court held: "It would seem that the action of the ordinary in changing dis-trict lines is final and not subject to review by writ of certiorari or otherwise." This case was referred to in a later case, where this ruling was reaffirmed; but it was also said: "While we are not in the least degree disposed to call in question the correctness

of this proposition, we are at the same time quite sure that it is within the power of the superior court, or of this court, to declare such proceedings and the final action taken therein absolutely void, whenever it becomes apparent that there was no law authorizing the same, or is manifest that no attempt was made to conduct them in conformity with valid existing regulations governing such proceedings, or that the action taken was in utter disregard thereof." *Howell* v. *Kinney,* 99 *Ga.* 544, 547 (27 S. E. 204). This was a full-bench unanimous decision. The latter case was where a petition was filed in the superior court for the charter of a private corporation; and third parties filed objections to the grant of such incorporation, upon the ground that the petition for charter did not state the amount of capital to be employed by the incorporators, and the petition had not been published as required by law. This court held that there was "no provision for a review by this court, by writ of certiorari or otherwise, of the action of the superior court in granting corporate powers to private companies." This case was cited in a later case where the principle was reaffirmed; but it was also said: "It is quite clear that the provisions of our law on this subject have not been framed to enable a stranger to the proceeding to make himself a party thereto, either as objector or otherwise, in order to resist the same; but it has never been held, to our knowledge, that any person whose name would be affected by the granting of a charter to one who fraudulently undertakes to appropriate such name could not assert his right in equity in a direct proceeding for that purpose, and make the same effective by injunction. On the contrary it has been distinctly held by this court that such right may be thus asserted." *Creswill* v. *Knights of Pythias,* 133 *Ga.* 837 (2), 847 (67 S. E. 188, 134 Am. St. R. 231, 18 Ann. Cas. 453). Obviously an unauthorized appropriation of another's name or an invasion of any other right would be a legal fraud, and would fall within the rule authorizing interference by a court of equity. It appears plain, therefore, that neither of the cases cited for the contrary view affords any authority for a ruling that a court of equity cannot go behind the action of the grand jury when it is alleged, and proof is offered to show, that there has been no sufficient compliance with the statutory requirements. They only decide that there can be no review by certiorari or other similar proceeding.

The petition in this case complains that there was an effort to transfer some 40,000 acres of land from Houston to Macon County without complying with the mode prescribed by the statute for making such a transfer. The issue is an important one. If this proceeding is held to be valid, other cases may arise involving still greater territory; for the power delegated to the grand jury and county commissioners in regard to the quantity of land within the county is almost unlimited. The fact that the statute makes no provision for the hearing of objectors before these bodies, and that no review of their judgment can be had, would seem at least to suggest a very powerful reason why a court of equity is authorized to afford protection against the disregard of the statutory requirements, and that citizens interested in the matter should not be left absolutely without any remedy for the adjudication of such an issue. This proceeding is an appeal to such equitable jurisdiction.

My conclusion is that the petition is not subject to general demurrer, and that the trial judge did not err in so holding. In this ruling Presiding Justice Beck, and Justices Hill and George concur.

2. There was no error in the rulings of the trial court on the special demurrers. As to this ruling all the Justices concur.

3. Justices HILL and GILBERT. A judgment on nonsuit was rendered in the case; and the briefs of counsel on both sides clearly indicate that the issue between them before the trial court was whether or not evidence was admissible at all going to show non-compliance with the statute after the grand jury had acted. The court ruled that it was not. Under such a ruling no amount of evidence of that character could have prevented a nonsuit. It is now suggested, however, that even if all of the evidence which was rejected by the court had been admitted, the court would nevertheless have been authorized to nonsuit the case. With great respect for the opinion of our learned associates who take the opposite view, we cannot accept this view. In our opinion there was ample evidence requiring the submission of the issue of fact to the jury.

FISH, C. J. I am constrained to dissent from the opinion of the majority of the court holding that the petition was not subject to general demurrer.

The Political Code (1910) of this State, providing for the change of county lines, declares, in § 468: "Whenever a citizen or any number of citizens of any county shall desire to have the boundary line of the county of his or their residence changed, they shall file in the office of the ordinaries of the counties to be affected, at least ninety days before the first day of the next term of the superior court of the counties whose boundaries are to be affected, a petition in writing, setting forth the exact character of the change to be made, specifying particularly the situation, direction, and existing marks and monuments, if any, of the original line, and describing particularly the direction, location, and length of the proposed new line, and setting forth the reason for such change. The person or persons applying for such change shall also give notice of the intention to apply for such change, by publishing the same for at least thirty days next preceding the terms of the superior court to be held in the counties to be affected, which terms shall be those occurring next after the filing of the petition with the ordinaries, by publishing such notice in a public gazette having general circulation in each of the counties to be affected by the change, and by posting at the door of the court-house in each of such counties, and at three public places in every militia district adjacent to the line to be changed, a like notice of the intention to apply for such change, and such posting shall be for a period at least of thirty days next preceding the terms of the superior court to be held in the counties next after the posting of the notice aforesaid." § 469. "It shall be the duty of the ordinaries of the counties whose dividing line is sought to be changed, to lay before the grand juries of their respective counties, on the first day of the term of the superior courts to be held next after the publication of the notice and the filing of the petition provided for in the preceding section, the original petition, together with all maps, plats, and other papers that may have been filed therewith; and if such grand juries shall, by a two-thirds vote of their respective bodies, approve the change applied for, they shall so declare in their general presentments, and this action of the grand juries shall be certified at once by the clerks of the superior courts to the ordinaries, board of commissioners of roads and revenues, or other officer having the control of county business in the counties to be affected, who shall, within thirty days from the date of such

certification, approve or disapprove the application, and certify their action to the ordinaries of their respective counties. When said ordinaries shall have satisfactory evidence of the concurrent approval of the grand juries, and of the officer or officers charged with the control of county business in the counties to be affected, they shall cause to be published for at least thirty days, in a public gazette having general circulation in their respective counties, an official notice of such concurrent approval and a description of the line approved." § 470. "When all the proceedings shall have been had in the manner prescribed in the preceding sections, and when the same shall have been fairly recorded by said ordinaries on the minutes of their respective courts, the new line or lines shall be held to have been established in lieu of the original line or lines."

When the case was before this court at the October term, 1917 (147 *Ga.* 626) it was said in the opinion rendered: "Prior to the constitution of 1877, the method of changing county lines was by a special act of the legislature for that purpose. In many instances several lots, in other instances a few acres, and in several instances only the 'residences' of certain named persons were transferred from one county to another. The following provision was inserted in the constitution of 1877: 'County lines shall not be changed unless under the operation of a general law for that purpose.' Article 11, sec. 1, par. 3, Civil Code (1910), § 6596. In 1879 the legislature passed its first act under this constitutional provision. Acts 1879, p. 42. That act provided that 'any citizen owning land adjacent to the boundary line of any county in this State, who may desire, for the necessity or convenience of performing the duties of citizenship, to have such lands transferred to an adjoining county, such citizen shall petition the ordinary of the county in which the land is situated for an order to have such transfer perfected,' etc., and prescribed the method by which such land might be transferred from one county to another. This method was by a jury trial upon proof of the necessary allegations of the petition. The act of 1881, supra, repealed the act of 1879, and gave to 'a citizen, or any number of citizens, of any county in this State,' desiring 'to have the boundary line of the county of his or their residence changed,' the right to do so by following the provisions of the act. The act

is a 'general law.' *Worth County* v. *Crisp County,* 139 *Ga.* 117 (76 S. E. 747). Under the act of 1881, the matter of taking proof was dispensed with. The grand jury is taken from all parts of the county, and is presumed to represent the sentiment of the county; and the present act seems to make the sanction by the grand jury of a petition for the change of a county line a matter of approval rather than legal finding."

By reference to the act of 1881, codified in §§ 468-471, inclusive, of the Political Code (1910), it will be seen that no provision is made for the hearing of objections to the application for the change of county lines, and no right of appeal from the action of the grand jury, or that of the commissioners, is provided. It will also be seen that no provision is made for the filing of objections before the Ordinaries, Commissioners or officers having charge of county business, and no right of appeal is given to either the applicant or any person dissatisfied with the action of the Ordinary in approving or disapproving the recommendation of the grand jury. These omissions, it is to be assumed, were not merely casual but intentional. The work of changing county lines is political or legislative, rather than judicial in nature. In this respect the action of grand juries and Ordinaries, Boards of Commissioners of Roads and Revenues, or other officers having the control of county business as to making changes in the county lines is similar to that of Ordinaries in changing county lines of Militia Districts. In *Hillsman* v. *Harris,* 84 *Ga.* 432 (11 S. E. 400), it was held: "1. It would seem that the action of the ordinary in changing district lines is final and not subject to review by writ of certiorari or otherwise. The district lines mark the territorial divisions of the county, and the power of establishing and changing them is in its nature political or legislative rather than judicial. 2. But granting the power of review, the opinion of the superior court should not be substituted for that of the ordinary save in cases of fraud or of gross abuse of discretion." In this case the petition was made to the ordinary to change the line between two militia districts of a named county. The petition alleged certain reasons why the change was expedient and necessary. Certain citizens of one of the districts filed a counter petition, asking that the proposed change be refused, alleging reasons why the change

should not be made, one being "that the change would cut off so much of the 948th district as not to leave in it a captain's company as required by law." A trial was had before the Ordinary, and evidence was submitted by both parties. A portion of the evidence submitted in behalf of the petitioners for change of the line was to the effect that "There would be over one hundred men left in the 948th district after the proposed territory was cut off, enough to form a captain's company." The Ordinary granted the application for the change. On certiorari to the superior court by the defendants the judgment of the ordinary was reversed, and petitioners excepted. In the opinion it was said by Chief Justice Bleckley: "It would seem that the necessity and expediency of a proposed change [of the lines of a militia district] are submitted by the law to the ordinary's judgment and discretion. So too is the final result after action by the commissioners,—'if the ordinary approves their report, he shall have all proceedings in the matter entered on his minutes, after which the . . line changed and defined shall be known and regarded accordingly.' No provision is made for reviewing the ordinary's approval, or for having any trial or investigation upon which to predicate a review. The ordinary may appoint commissioners of his own motion. He is not required to wait for a petition; and when there is a petition, there is no provision for answering or resisting it by other parties. In this respect the matter is somewhat like that dealt with in *Meadows* v. *Taylor,* 82 *Ga.* 738 (10 S. E. 204) [where it was held: "The statute providing for elections respecting fences and stock-law in and for a single militia district, makes no provision for a counter-petition, or for any contest or hearing before the ordinary. The ordinary's action upon such a petition is ministerial, not judicial, and certiorari will not lie for the correction of any error or mistake in his conduct."] The approval of the ordinary may be induced by anything that occurs to his own mind. He may act on his own personal opinion irrespective of any and all evidence. Indeed there is no provision for taking evidence or having any trial upon the question whatever. And the omission to furnish machinery for such a purpose was, we may suppose, not merely casual, but intentional. The work of changing the lines of militia districts is political rather than judicial in its nature, these districts being

the political divisions of a county, and sustaining with reference to the county a relation somewhat like that which the counties sustain to the State. We doubt, therefore, whether it is in the power of the superior court to substitute by judgment upon a certiorari, or otherwise, its opinion for that of the ordinary as to the necessary and expedient location of district lines." It was further said in the opinion, that, assuming the power to review the approval of the ordinary exists in such cases, " There is no suggestion of fraud or wilful abuse of discretion on the part of the ordinary; and without that or something equivalent to it, we think his official decision as to where the district line ought to be should control. He is a local officer elected by the people of his county, chosen for his fitness to decide such questions; and if the people are not satisfied with his administration, they will have an opportunity of dispensing with his services and substituting another in his place by popular election. His successor can restore the line to its former position, if he shall deem it necessary and expedient to do so. As far as we can see, this is the only remedy, upon the facts in the record before us, for any mistake of judgment that may have been committed by changing the district line under consideration." The quotations I have made from that case are, I think, peculiarly applicable to the action of grand juries, and other officers having control of county business, in changing county lines.

In *Dew* v. *Smith,* 130 *Ga.* 564 (61 S. E. 232), one of the points involved was whether the judgment of the Board of Commissioners of Floyd County in changing the lines of a Militia District was void on the ground that it appeared such board did not exercise any discretion in determining upon the necessity or expediency of the change, but delegated their discretion to the special commissioners appointed to report upon the expediency and utility of the change. In the opinion it was said: " The board had a legal right to reject this report and act upon their own judgment. *Hillsman* v. *Harris,* 84 *Ga.* 432 (11 S. E. 400). Their concurrence with the special commissioners, as to the necessity and expediency of the proposed change, was none the less the affirmative action of the board, because of their adoption of the report made to them by the commissioners pursuant to the statute. The law contemplates that such action as is taken by the board

of commissioners, in the absence of fraud or a wilful abuse of
their discretion, shall be final, and the only remedy of those
dissatisfied persons affected thereby is that indicated in *Hillsman*
v. *Harris,* supra, namely, they will have an opportunity of appear-
ing before the successors of the present commissioners, who can
restore the lines if they deem it necessary and expedient.."

In *Hudson* v. *Sullivan,* 93 *Ga.* 631 (20 S. E. 77), wherein it
was sought to review by certiorari the action of a Board of Roads
and Revenues in changing the line between two militia districts,
and where the judge of the superior court refused to sanction
a petition for certiorari, which ruling was assigned as error, it
was said: "In our opinion, the judge was right. The strong
intimation of this court in *Hillsman* v. *Harris,* 84 *Ga.* 436, that
the action of the ordinary in changing district lines is final, and
not subject to review by the writ of certiorari, or otherwise, is
now adopted as the correct law upon this question. Of course,
it makes no difference in principle that, in the present case, the
action complained of was taken by the board of county commis-
sioners instead of the ordinary, they having jurisdiction of the
matter. The reasons given by Chief Justice Bleckley in the case
cited are, we think, sufficient, and conclusive upon the question
presented."

In *Howell* v. *Kinney,* 99 *Ga.* 544 (27 S. E. 204), the validity
of a change in the lines of a militia district was involved. It was
held: "1. While the determination by an ordinary, or board
of county commissioners, in proceedings to change militia dis-
trict lines, cannot be directly reviewed by certiorari or other-
wise, it is within the power of the superior court, or of this court,
if such proceedings, or the final action taken therein, be for any
reason void, to so declare, when the question of their validity is
properly presented for adjudication. . . 3. The law does not
contemplate that in proceedings to change a line between two
militia districts, an isolated portion of the territory of one of
them, not contiguous to the other, should be transferred to the
latter; nor that, as a result of given change in lines, two por-
tions of a district should be left entirely segregated from each
other. 4. Inasmuch as none of the alleged changes in the lines
of the militia districts involved in this case were legally made,
and the petitioners' right to an injunction necessarily depended

upon the validity of such changes, it was error to grant the injunction." In the opinion it was said: " It has frequently been held by this court that the determination by an ordinary, or board of county commissioners, in proceedings to change militia district lines cannot be directly reviewed by certiorari or otherwise. While we are not in the least degree disposed to call in question the correctness of this proposition, we are at the same time quite sure that it is within the power of the superior court, or of this court, to declare such proceedings and the final action taken therein absolutely void, whenever it becomes apparent that there was no law authorizing the same, or is manifest that no attempt was made to conduct them in conformity with valid existing regulations governing such proceedings, or that the action taken was in utter disregard thereof. For instance, if an ordinary or county board, acting upon a private letter signed by an individual, should peremptorily issue a proclamation declaring that a designated change was thereby made in the lines of two militia districts, no one would for a moment contend that the proclamation amounted to anything. Again, if, upon proceedings entirely lawful and regular down to the time when the final action was to be had, an order should be passed undertaking to define a change in district lines, and which described the new line so imperfectly that its location could not by any possibility be ascertained, it is obvious that the order would be a mere nullity. These illustrations might be multiplied indefinitely, but those given will suffice to indicate the distinction to be drawn between that class of cases which merely involve the question whether or not the discretion vested in the county authorities designated by law to deal with the matter has been wisely and judiciously exercised, and such cases as collaterally present the question whether the action taken by the county authorities in a given proceeding of this kind can properly be deemed to have any legal effect, when the same is so indefinite or repugnant to the provisions of law upon which it was based that it could in no event have any lawful or practical operation."

When the instant case was formerly before this court (147 *Ga.* 626) it was said in the opinion: "That the legislature, prior to the adoption of the constitution of 1877, had the absolute power to change existing county lines, is not doubted. That the legislature, under the constitution of 1877, may by general law delegate

this power, can not be questioned. From what we have said it follows that the act of 1881 was within the competency of the legislature. The right of appeal is not necessary to its validity. Indeed, the right of appeal is matter of grace, and is fixed by statute. The question is above private-property rights and relates to the political subdivisions of the State. We have assumed, and are fully warranted in so assuming, that a court of equity may prevent the change of a county line where the law under which the change is sought to be made is for any reason unconstitutional and void. *County of DeKalb* v. *Atlanta* [132 *Ga.* 727, 65 S. E. 72]. We have conceded, without deciding, that a court of equity may also interfere to prevent the change of a county line, if fraud or corruption be shown, or if it appear that the discretion vested in the officers authorized to make such change is being manifestly abused to the oppression of the citizen and taxpayer. Cf. *City of Atlanta* v. *Holliday*, 96 *Ga.* 546 (23 S. E. 509); *Hudspeth* v. *Hall*, 113 *Ga.* 4, 7 (38 S. E. 358, 84 Am. St. R. 201)." In the case at bar no fraud or corruption, or manifest abuse of discretion to the oppression of any citizen and taxpayer, on the part of the grand jury or the board of commissioners, is alleged; and therefore it is plain to my mind that equity will not review the exercise of the discretion vested by the legislature in the grand jury and board of commissioners in the performance of a mere political or legislative function. The case of *Creswill* v. *Knights of Pythias*, 133 *Ga.* 837 (2), cited in the majority opinion, involved fraud.

The constitution of this State (Civil Code, § 6446) declares that " The General Assembly shall have no power to grant corporate powers and privileges to private companies, . . but it shall prescribe by law the manner in which such powers shall be exercised by the courts." The statute carrying into effect this provision of the constitution, contained in § 2823 et seq. of the Civil Code (1910), confers upon the superior courts of this State power to create private corporations, with certain stated exceptions, and prescribes the method of incorporation. Among other things, it is provided that the persons desiring the charter shall file in the office of the clerk of the superior court of the county in which they desire to transact business a petition, specifying the object of their association, and " the amount of capital stock to

be employed by them actually paid in." It is further provided that the petition *shall* be published once a week for four weeks in the nearest public gazette to the point where such business is located, before said court shall pass an order declaring said application granted. While the provisions of the constitution referred to above deal with different subject-matters, both provisions sanction the delegation of legislative authority, and the legislation carrying each provision into effect is in principle similar.

In the case of *Gas-Light Company of Augusta* v. *West,* 78 *Ga.* 318 where (as appears from the official record of the case of file in this court) objection was made to the grant of the charter by the superior court, upon the grounds that the petition for charter did not state the amount of the capital to be employed by the incorporators, and the petition had not been published once a week, etc., for four weeks, as required by law, it was held: " The power conferred by the constitution upon the courts to grant charters to corporations is legislative and not judicial in its character; and there is no provision of law authorizing any one to appear and object to the grant of corporate powers by the courts." The decision in that case has been followed by this court. See *In re Union Club,* 142 *Ga.* 261 (82 S. E. 643), and cases there cited.

The statute confers a discretionary power upon grand juries, county boards of commissioners, and other officers having control of county business, in respect of their action in changing county lines; and the law is well settled that where public officials " are acting within the scope of their duties and exercising a discretionary power, courts are not warranted in interfering, unless fraud or corruption is shown, or the power or discretion is being manifestly abused, to the oppression of the citizen." *Hudspeth* v. *Hall,* supra, and cit. It was held in *Ivey* v. *City of Rome,* 129 *Ga.* 286 (58 S. E. 852): " When the General Assembly provides for an election to determine the question as to whether the territory of one municipality shall be annexed to the territory of another municipality, and no provision is made in the law for judicial interference, and there is no general law authorizing such interference, and the authority to interfere can not be derived from the common law, a court of equity has no power or jurisdiction over the matter, and all questions arising out of the election must be determined alone by the tribunal constituted by the General

Assembly for that purpose." The petition in that case alleged, in effect, that the true result of the election was a tie; that the managers of the election without valid cause removed two ballots against annexation from the box and excluded them from the final count, while every vote for annexation was included in the count; and other irregularities were set forth. The prayer of the petition was that the authorities of the City of Rome be restrained from declaring the result, and that at the final hearing a decree be entered that the scheme of annexation had been defeated. The word "shall" was used in the statute as to the provisions for holding the election. This court affirmed the judgment of the trial judge dismissing the case, and said the petition was subject to general demurrer; citing the following cases: *Skrine* v. *Jackson, 73 Ga.* 377, wherein it was held: "1. Under the act of 1872 (Code, § 1449), the ordinary is required, under certain circumstances, to order an election to determine the question of 'fence' or 'no fence;' the returns are to be made to him, and he is required to examine them and decide upon all questions that may arise out of the election, and proclaim the result. This is a part of the political power of the State which the legislature has seen fit to confer upon the ordinary; and without some authority vested in the judicial department, it cannot intervene or interfere in any manner with the power so granted to him. No provision is made by the act for any review of the decision of the ordinary, and it seems to have been contemplated that his action should be final and conclusive. (*a*) Neither the common-law remedy by information in the nature of a quo warranto is applicable to the case, nor is there any statute authorizing the courts to inquire into the legality of such an election. 2. If the courts had jurisdiction in such a case, the remedy should have been sought before the ordinary had acted and the result had been proclaimed. After the ordinary had decided the questions before him and proclaimed the result of the election, it was then too late to seek redress by injunction." Another case there cited was *Caldwell* v. *Barrett, 73 Ga.* 604, wherein it was held: "Where the legislature provides for an election to determine the question of prohibiting the sale of liquors in a certain county, and no provision is made in the law for judicial interference, and there is no statute authorizing such interference, and no authority exists at common

law, neither a court of law nor of equity has any power or jurisdiction over the matter, but matters arising out of such elections must be determined alone by the tribunal constituted by the legislature for that purpose. The courts are powerless to interfere, unless the legislature shall see proper to confer such power on them." The other case there cited was *Ogburn* v. *Elmore,* 121 *Ga.* 72 (48 S. E. 702), where it was held: "1. The general rule is that equity will not interfere in any matter growing out of an election, which may be determined by a contest prescribed in the statute providing for the election. 2. The general local option liquor law providing that an election held thereunder may be contested for any cause which 'impeaches the fairness of the election or the conduct of the ordinary,' by proceedings instituted either in the superior court or before the ordinary, equity will not enjoin the ordinary from proclaiming the result of an election held under the law, on the ground that notice of the election had not been published for the prescribed time." These cases were approvingly cited in *Harris* v. *Sheffield,* 128 *Ga.* 299 (57 S. E. 305), wherein one of the holdings was that " Performance of a political function by a court is not inherently judicial, and whatever jurisdiction over matters of a political nature with which courts may be constitutionally invested is derived from a statute."

In my opinion, the language of the statute providing for the change of county lines in respect of giving notice of intention to apply for the same is not mandatory so as to require a literal and exact compliance with it. The statute provides for the publication of such notice " in a public gazette having general circulation in each of the counties to be affected by the change." And after the grand jury had duly recommended the change, and the board of county commissioners had duly approved the action of the grand jury, would any citizen of either county be permitted to set aside, in an equitable action, the order of the board of commissioners on the ground that the public gazette in which a notice of the change had been published for the requisite time did not have general circulation in the counties to be affected by the change, but that such gazette had only a limited circulation in both counties, and that some other public gazette not published in either county had a much larger and more general circulation therein than one in which the notice was published? Or, if the notice had been posted

at the door of the court house in each county, would equity enter-
tain a suit to set aside the order of the board of county commis-
sioners on the ground that in either one of the counties to be af-
fected the notice was not at the front door of the court-house, but
at a side door, or that the notice, although posted on the front
doors, had been torn away purposely by some one, or accidentally,
and was not replaced for some days? Or, that while notice had
been posted at three places in every militia district adjacent to the
line to be changed, one of such notices was posted at a place
that was not considered a public place; or, if posted in three pub-
lic places, that one of the notices had been destroyed purposely,
or accidentally, and not replaced within a few days? It is clear
to my mind that none of the supposititious instances would au-
thorize a court of equity to set aside the action of the grand jury
and county commissioners where they had exercised a discretionary
power vested in them under the statute, where there was no pro-
tense of fraud or corruption, or that such discretion had been
manifestly abused to the oppression of any citizen, or against the
public interest. Moreover, I may say that there is no allegation
in the petition that the petitioners did not have notice or actual
knowledge of the pendency of the proceeding before the grand
jury acted upon it, or that petitioners did not protest to the in-
dividual members of the grand jury against the change of the
county line and submit to them such reasons why the change should
not be made as appeared to petitioners to be reasonable and good.
It does appear in a paragraph of the petition, not stricken on
demurrer, that prior to the presentation of the petition for a change
of the county line between Macon and Houston Counties a pub-
lic mass meeting was held in Houston County, where the matter
of creating a new county from a portion of that county, and also
the matter of changing the line between the two counties named,
were discussed and resolutions passed. So far as the petition
shows to the contrary, all of the petitioners may have been present
and have taken part in the proceedings before such meeting, or
they were fully cognizant of all that took place therein.

The word "shall" is not always construed as mandatory. In
*Brooks* v. *Rooney,* 11 *Ga.* 423 (6), 428 (56 Am. D. 430), it was
held: "The acts which make it the duty of the sheriff to adver-
tise the sale of property in a particular way, and to sell between

certain hours of the day, are merely directory to the officer." The statute, Civil Code (1863), § 3576, declared: "It shall be the duty of the sheriff" to publish notice of sale in a newspaper for thirty days. The constitution (1798) of this State, article 3, section 1, declared, that, "In all cases where a new trial shall be so allowed, the judge allowing the same shall enter on the minutes of said court his reasons for the same." It was held in *McDaniel v. Strohecker*, 19 *Ga.* 432, that such provision of the constitution was merely directory. In *Martin* v. *McConnell*, 29 *Ga.* 204, it was held that the statute (Civil Code of 1863, § 3666) providing for the filing of a claim to realty about to be sold by an administrator, and which declared that a copy of the claim "shall be served on such . . administrator . . previous to the day of sale," was merely directory. And in *Tanner* v. *Hollingsworth*, 41 *Ga.* 133, it was held: that part of rule 11 of the Supreme Court (Civil Code of 1873, p. 954), declaring that the clerks of the superior court shall transmit to the clerk of the Supreme Court bills of exceptions and transcripts of records by mail or express, and that "in every case he shall take a receipt from the postmaster or express agent, and transmit a copy thereof to the clerk of this court," was merely directory. The cases cited in the opinion of the majority of the court, on the general demurrer, to sustain the view that every requirement of the statute providing for the change of county lines, in regard to notice as therein provided is a condition precedent to the exercise of the power conferred upon the grand jury and board of commissioners, do not, in my opinion, support the ruling made. One of the cases cited is *Roberts* v. *Murphy*, 144 *Ga.* 177 (86 S. E. 545), wherein it was held: "In a special election called by the ordinary by virtue of the Civil Code (1910), § 1535, to submit to the voters of a school district the question of a special tax for educational purposes, the notice of the election must be given in strict conformity with the code section, and a failure to post the notices as therein required vitiates the election. Injunction is an available remedy to owners of property in a taxing district, to stay the collection of taxes attempted to be collected by virtue of the authority of a void election." The statute authorizing the ordinary to call an election for submitting the question whether a special tax for educational purposes shall be levied in a school district gave him such power, " provided that

notice of the same shall be posted in at least three conspicuous places in the district ten days prior to the election." Another case cited is *Dooly* v. *Fairmount,* 146 *Ga.* 689 (92 S. E. 209), wherein also was involved the question as to the legality of an election to levy a tax for the purpose of establishing and maintaining public schools. It was there held: "The election was void for the reasons that the resolution of the municipality was too indefinite as to the amount and rate of the tax, and the notice of election was not in compliance with the act of 1910." The case of *Ray* v. *Swain,* 148 *Ga.* 203 (96 S. E. 209), is also cited. In that case the petition was filed to enjoin the assessment, levy, and collection of a tax for the purpose of supplementing the public-school tax by an extra levy in a school district, on the ground that the election was void because held within less than twenty days from the receipt of the petition by the ordinary, whereas the law requires that the election be held not less than twenty days nor more than sixty days from the receipt of such petition; that the petition did not show on its face that it contained the signatures of one fourth of the qualified voters of the district, and this fact is jurisdictional, and can not be supplied by aliunde evidence, and that the court erred in receiving such evidence over appropriate objection; and further that it did not appear from legal evidence that the ordinary had ever issued any order calling the election, and that this fact could not be shown aliunde, but must be shown from the record. It was held by a majority of the Justices presiding that the court erred in refusing to restrain the assessment, levy, and collection of the tax, on the ground that a valid order calling an election of the character indicated was essential to the holding of a legal election for a tax levy, and that no such order was shown. The power to impose taxes is vested exclusively in the General Assembly, and can not be exercised except in pursuance of its authority; and while under the constitution of this State the legislature may delegate to counties and municipalities a limited right to levy taxes for certain purposes, no tax of any kind can be levied upon the citizen or his property save in pursuance of a positive law, nor in any other manner than in accordance with the provisions of such a law, and the terms of the law must be strictly observed. There is no need of citation of authority to sustain this well-recognized principle.

The other case cited by the majority of the court, on this point, is *Hall* v. *City of Macon*, 147 *Ga.* 704 (95 S. E. 248), wherein it was held: "The provision of the charter of the City of Macon (Acts 1914, p. 998, sec. 24), 'That every ordinance of the council . . shall, before it takes effect, be presented, certified by the clerk, to the mayor' for his approval or disapproval, is mandatory." Clearly this was a correct ruling, because the charter provision declared, in effect, that no ordinance of the council should be valid unless presented, certified by the clerk, to the mayor. It seems to be clear that the rulings in these cases are not controlling in the case at bar. I am authorized by Mr. Justice Atkinson to say that he concurs with me in the view that the court erred in not sustaining the general demurrer to the petition.

The majority of the court, Presiding Justice Beck and Justices Atkinson and George concurring with the writer, are of the opinion that the trial court did not err in granting a nonsuit on the hearing before the jury. The evidence offered by the petitioners, and rejected on objection by the defendants, we think, was inadmissible, except as to the admission by the defendants, on the interlocutory hearing, that notices were not posted in the 528th militia district of Houston county, which in our view of the case was immaterial. But, even if in error as to this, then in our judgment a nonsuit would have been proper if all of such rejected evidence had been admitted. It is well enough to again advert to the fact that, as the injunctive features of the case no longer existed, the only issue submitted to the jury was whether the 528th militia district of Houston county is adjacent to the county line between Macon and Houston Counties sought to be changed — it being conceded for the purpose of deciding the case that defendants had admitted that no notices were posted in that district. The petitioners offered in evidence the following certificate:

*"Militia Districts in Houston County, Georgia.*

| No. | Name. |
|-----|-------|
| 619 | Lower Town |
| 528 | Ninth |
| 527 | Tenth |
| 500 | Upper Eleventh |
| 541 | Old Thirteenth |
| 970 | Lower Eleventh |

| 771 | Upper Fifth |
| 887 | Sixth |
| 769 | Lower Fifth |
| 542 | Twelfth |
| 928 | Upper Town |
| 492 | Lower Fourteenth |
| 765 | Upper Fourteenth |
| 926 | New Thirteenth |

" I, C. A. West, Secretary of the Executive Department of the State of Georgia, do certify that the above and foregoing is a true and correct copy of the numbers and names of the Militia Districts of the County of Houston, State of Georgia, as appears of record in the Executive Department of said State, in the Militia District Book. This the 28th day of March, 1918.

C. A. West, Secretary of the Executive Department.
"Seal Executive Department of Georgia."

The defendants objected to the admission in evidence of this certificate, one of the grounds of objection being to the effect that reports of militia districts are not required to be filed in the Executive Department, and that the secretary of that department had no right to make such a certificate. The court sustained the objection, and the certificate was excluded. The court, we think, did not err in this ruling. An officer can only issue certificates of a record or document properly of file in his office.

The County of Houston and other designated counties were organized by the legislature in 1821 (Acts 1821, p. 44). The only provision of the act indicating the territorial limits of Houston County is in section 9, which reads: "That whenever the militia of the aforesaid counties are organized, agreeably to the provisions of this act, they shall be attached as follows: The County of Houston to the first brigade of the sixth division." The first brigade and the sixth division were composed of the counties of Twiggs, Wilkinson, Laurens, and Pulaski. (Acts 1820, Dawson's Comp. 278.) An act of Congress enacted May 8, 1792, was passed for the arrangement of the militia of the several States. Section 3 of that act provided: "The militia of the respective States shall be arranged into divisions, brigades, regiments, battalions, and companies, as the legislature of each State may direct; and each division, brigade, and regiment shall be numbered

at the formation thereof; and a record made of such numbers in the Adjutant-General's office in the State." The act further declared what should compose the divisions, brigades, regiments, battalions, and companies, and that each battalion should consist of five companies, and designated the officers and defined their duties, and among such officers were captains of companies. The act declared that there should be an adjutant-general appointed in each State, and defined his duties. The legislature of this State in 1807 passed an act (Acts 1807, Clayton's Digest, 408) to carry into effect the act of Congress of 1792. This act of the legislature, among other things, provided in section 2 thereof that changes in old or the creation of new company districts made by commanding officers of regiments, battalions, and companies shall be designated by " certain lines and bounds and recorded by the clerk of the respective regimental courts of inquiry," etc. An act of 1818 (Lamar's Digest, 459) was passed " to revise and consolidate the militia laws of this State." This act repealed all former acts regulating the militia of the State. This act, section 2, declared that the creation or alteration of any division or brigade district shall be made by the legislature, " and a record made of the same in the adjutant-general's office, as well as the organization of the divisions and brigades heretofore created and defined." Section 3 required the creation of any new regimental, battalion, or company district, or alteration in any such theretofore laid off, to be made by the commanding officers of regiments, battalions, and companies assembled by order of the commanding officers of regiments, and that such officers " shall proceed to lay off or alter any such regimental, battalion, or company district or districts; which districts shall in all cases be designated by lines and bounds, and be recorded by the clerks of the respective regimental courts of inquiry." Section 5 provided that such districts, including company districts, should be numbered. Section 24 provided for the election of clerks of the regimental courts of inquiry. This section also provided that such clerks should issue warrants of distress and sale against delinquents of companies upon whom fines had been imposed, and deliver same to the constables of the districts, who should execute them as in civil cases. This statute was in force in 1821, when Houston County was created. Section 3 of the act creating Houston County and the other counties named

provided: "That the justices of the inferior courts of the counties aforesaid shall have full power and authority, and shall proceed, as soon as may be after their appointment, to lay off the said counties respectively into as many captain's districts as they in their discretion may think proper; and whenever said districts shall be so laid off and defined, the justices of the inferior courts aforesaid, or any two of them, shall advertise and superintend an election in each captain's district for two justices of the peace, giving fifteen days notice thereof; who shall be commissioned by the Governor, and continue in office until the next election in course for justices of the peace, throughout this State, unless their offices shall sooner become vacant by law." Section 4 provided: "That it shall be the duty of the justices of the peace, after they shall have been commissioned as aforesaid, to advertise, in their respective districts, the elections of captains and subaltern officers, as required by the militia laws in force in this State; the said elections to be superintended and certified agreeably to the provisions of the said militia laws." It will be observed that it was made the duty of the justices of the inferior court of Houston County to lay off and define captain's districts of the county. But the act did not require any report or return of the action of such justices in laying off and defining such districts. The power and authority conferred upon them as to this matter was purely political or legislative, and not judicial; and therefore we must assume, if they made any report of their action, that it was not filed and recorded in the office of the inferior court, with judicial records, but, as the act of 1818, above referred to, required that company or captain's districts should be designated by lines and bounds and recorded by the clerk of the respective regimental courts of inquiry, that any report or return, if made by the justices of the inferior court of their action in laying off and defining captain's districts in Houston County, was returned to and recorded in the office of the clerk of the proper regimental court of inquiry, as required by that act. This assumption is further authorized by the provision in the 4th section of the act of 1821, as to the duty of the justices of the peace of the captain's district to make certificates of election of company officers, "agreeably to the provisions of the said militia laws." It clearly appears from the acts of 1807, 1808, and 1818, as to the militia laws of the State,

that the captain's and company districts were the same as what are now known as militia districts. We have been cited to no statute, or authority existing prior· to 1821, when Houston County was created, requiring the numbers, names, and descriptions of such districts to be filed or deposited in the Executive office of this State, and if there be any such records in that office, we are aware of no statutory provision or authority for their deposit there. The certificate offered in evidence and rejected does not purport to show the boundaries or descriptions of any of the militia districts in Houston County. It is true that "9th" ap-pears opposite the number "528." Certainly this alone is not sufficient to show that the ninth land district was coextensive with the 528th militia district.

It is a matter of common knowledge that militia districts, cer-tainly as a general rule, do not bear the names of land districts. The certificate offered in evidence shows that the name of one of the numbered districts is "Lower Town," another "Upper Town," and other such names as are not usually given militia districts. Therefore it seems clear that it would require something more than the mere word "ninth," opposite the number of the militia district 528, to show that the ninth land district and militia district 528 were the same, or coextensive. We therefore conclude that even if the certificate were admissible as to a matter prop-erly of record in the Executive office, it would not of itself be sufficient to show even presumptively that the 528th militia dis-trict and the ninth land district were identical.

The provision of the Political Code, § 379, is not authority to support the contention that the numbers and names of the militia districts are required to be kept in the Executive department. Sec-tion 376 of that code is as follows: "Whenever it may be neces-sary and expedient to lay out a new militia district, or to change the lines of old ones, or to consolidate or abolish old districts, the ordinary may, at any time, appoint three commissioners, citizens of the district or districts from which it is proposed to make the new district, or change the lines thereof, whose duty it shall be to lay out and define such lines, and report the same to the said ordi-nary." The next section authorizes such commissioners to engage the services of a competent surveyor to assist them as to their duties in laying out and defining the lines of newly created dis-

tricts, or the changed lines of old districts.   The following section requires the ordinary, if he approves the report of the commissioners, to enter the proceedings on his minutes; and then section 379 is in this language: "It is the duty of such ordinary, if a new district is laid out, to transmit instanter to the Governor such proceedings from his minutes, duly certified, and to publish them for thirty days at the door of the court-house and in the public gazette where he does his official advertising." It will be noted that the ordinary is required to transmit to the Governor a certified copy of the ordinary's minutes only where a new district is laid out, and there is no such requirement where merely the lines of old districts are changed, or where only old districts are consolidated or abolished.   These sections are codifications of the acts of 1839 (act December 23, 1839 — Cobb's Digest, 186), and the act of December 23, 1840 (Cobb's Digest, 187), which were passed more than eighteen years after the act of 1821, creating the County of Houston, which declared that the justices of the inferior court of that county should lay off and define the captain's [or militia] districts of that county, and wherein there was no provision for such justices transmitting any record, if they should make any, in respect of their action in the matter, to the Governor.   But, as we have already stated, the clear presumption is that if the justices made any report or record of their action, it was their duty to transmit it to the clerk of the proper regimental court of inquiry.   By what authority any record of the names, numbers, and descriptions of the old militia districts laid out and defined prior to the acts of 1839 and 1840 were deposited in the Executive Department, we have, as already intimated, been unable, after a diligent search, to ascertain.   The certificate offered in evidence itself indicates that there is nothing of record in that department as to captain's or militia districts, save numbers and names, with no descriptions defining their limits or boundary lines.

Petitioners introduced in evidence a certified copy, from the office of the Secretary of State, of a land map of Houston County, showing the numbers of the land districts, and the numbers of land lots in each land district.   It appears from such map that a part of the 9th land district is adjacent to and borders on a portion of the line sought to be changed between Houston and Macon

Counties. No militia or captain's districts appear on the map. Petitioners offered the testimony of a number of witnesses for the purpose of showing that the 528th militia district, and the ninth land district of Houston County were coextensive and the same. One witness offered to testify to the effect: that he is the county surveyor of Houston County, and has been for 6 or 8 years; that he has lived in that county for 70 years; that he lives in the 528th militia district, in Fort Valley; that he has "always considered the boundaries of the 528th district the same as the 9th district of Houston County. . . The district comes beyond Big Indian creek, because my plantation is beyond the creek, that is, the 9th and 528th districts. . . I vote in the 528th district, although I live beyond Big Indian creek." Another offered to testify: "I am justice of the peace for the 528th district, and have been for 19 or 20 years. I know some of the boundaries of that district, but I can not describe them. I know the boundaries of the 528th militia district as compared to the boundaries of the 9th land district. I have been having cases all over the district, and my limit was the 9th district in the south and up that way to Crawford County in the west, and the east limit these shanties down here, and the north limit Mossy creek. I understand the boundaries of the 9th land district and the 528th militia district as the same, identical, the southern boundary especially, because I know. I know my district, and I always thought they were identical. The man that I succeeded was there 20 years, and he told me that was his line, and I have been going by the same line. Judge Branham was justice of the peace for 20 years before me, and he told me the land and militia district lines were the same." Another as follows: "I have been county deputy sheriff of Houston County for 6 years. I served as constable for the 528th district for about two years before I was appointed deputy sheriff. I now live in the 528th or 9th district. I have always understood the boundaries of the 528th and 9th district were the same. When I was acting as constable for the 528th district I served papers all over the 9th land district. I am a taxpayer." Another as follows: "I live at Fort Valley. I have lived in this county off and on all my life. My profession has been that of a lawyer, and used to practice in the justice courts. I do not know the lines of the 528th district;

all I know is that my understanding has been, and what I have acted on, was that the 9th district was the 528th."

A number of other witnesses were offered to testify in behalf of petitioners, to the effect that they had resided in the 528th militia district and the 9th land district of Houston county, each for a stated number of years, varying from one to fifty-seven, and that each of them had always understood, or considered, or thought, or regarded, or had been informed, that the 528th militia district and the 9th land district were territorially the same. All of this offered testimony was objected to by the defendants, upon the grounds, among others, that there was higher and better evidence of the location of the district lines of the county, that it was merely the opinion or understanding of the witnesses, and that it was immaterial and irrelevant. From what we have already said, we think the court was right in rejecting all of this proffered testimony. The best evidence of the militia-district lines would be a certificate from the proper office, where the numbers and boundaries or descriptions of the districts were required by law to be filed, or recorded. We have endeavored to show that the Executive Department was not such office as to the districts created before the acts of 1839 and 1840. It is true that petitioners offered to show that counsel for the defendants on the former trial admitted before the court that there was nothing in the ordinary's office of Houston County relating to the 528th militia district; but such admission was properly rejected, in our opinion, because, although the records of the old inferior court should be in that office, there was never any law requiring any evidence of the action of the justices of the inferior court of Houston County in laying off and defining the captain's or militia districts of that county, which action was purely political or legislative, to be filed or recorded in the office of that court. If, however, we are in error as to this, then the offered testimony was correctly rejected on the other grounds, as it was not competent to show the lines of the militia district by what the witnesses merely thought, understood, regarded, or had been informed as to where they were, without giving any source, reason, or basis for their testimony, other than that they had lived in the district for many years.

"Whether a boundary line of a militia district coincides with the county line must be shown by the public records kept accord-

ing to law, where such record exists. Where the record does not exist, the facts may be shown by aliunde evidence." "Traditionary evidence as to ancient boundaries and landmarks is admissible in evidence, the weight to be determined by the jury according to the source whence it comes." Civil Code, § 5772. .The testimony of the witnesses offered by the petitioners to show that the 528th militia district and the 9th land district of Houston County were territorially the same was not admissible under these rules of evidence. As we have shown, there was no competent evidence that no record of the militia district lines of Houston County existed. In our opinion, the testimony offered was not admissible under the section of the code quoted as to traditionary evidence in respect of ancient boundaries and landmarks. In *Ivey* v. *Cowart,* 124 *Ga.* 159 (3), 161 (52 S. E. 436, 110 Am. St. R. 160), it was held: "Where the location of the line between two counties was uncertain and disputed, and the line between adjoining lands coincided with the county line, which was claimed by both sides to be a straight line, evidence was admissible to show that for a considerable distance south of the place where the line was in dispute owners of land in the two· counties, whose lands were bounded by the county line, had built fences up to a certain line and recognized it as being the county line, and had so bounded their possessions for twenty years or more; and that the line run between the lands of the parties by processioners was a continuation of the line so recognized." This ruling does not support the contention that the testimony offered by petitioners was admissible.

In *McAfee* v. *Newberry,* 144 *Ga.* 473 (87 S. E. 392), it was said: "Traditionary evidence as to ancient boundaries and landmarks is admissible. Civil Code (1910), § 5772. But the reputation in the neighborhood at the present date is not admissible unless it be traditionary or derived from ancient sources or from those who have peculiar means of knowing what the reputation of the boundary was at an ancient date. Shutte *v.* Thompson, 82 U. S. 151 (21 L. ed. 123). There was no preliminary proof showing the source of information of the persons from whom the witness obtained his information. If his informants were acquainted with the land lines, they were competent witnesses to the fact to which the plaintiff proposed to testify, and his testimony clearly would not have come within the exception to the general rule of hearsay.

Before reputation as to boundaries will be received in evidence, not only must it appear that the tradition is ancient and did not arise after any controversy respecting the title to the land, but the tradition must have something definite to which it can adhere, or be supported by corresponding enjoyment and acquiescence. For instance, a tree may be shown to have been pointed out by persons of a bygone generation as the corner referred to in an old grant or deed. A tree is something to which the tradition can adhere. Mendenhall *v.* Cassells, 3 Dev. & Bat. (20 N. C.) 50. It is one ·thing to locate the ancient landmarks and boundaries by traditional evidence, but it is quite a different thing to show by such evidence that an unlocated larger tract embraces a smaller one. In the former instance the definite thing upon which the reputation hangs is something which exists as a landmark or boundary, and relating to which there would be common knowledge in the neighborhood. But it would not be competent to prove by tradition a general reputation that a smaller tract of land is covered by a deed to a particular person, where the land is described by a particular name, and is not definitely located by any evidence. Toole *v.* Patterson, 31 N. C. (9 Ired.) 180. To state the proposition a little differently, title to land can not be proved by parol. Thus, testimony that a lot 'was known ·in the neighborhood as John Hardy's land' is inadmissible to show that it was John Hardy's land. Testimony that the witness had heard the land in dispute 'called the Bailey lot by settlers around there' is inadmissible, because hearsay. *Shingler* v. *Bailey,* 135 *Ga.* 666 (8) (70 S. E. 563) ;· *Heatly* v. *Long,* 135 *Ga.* 153 (8), 154 (68 S. E. 783)."

The court rejected evidence to the effect that counsel for the defendants, upon an interlocutory hearing before the trial, admitted that no notices were posted in the 528th militia district of Houston County of the intention to apply for a change of the county line in question. This evidence was immaterial, because petitioners failed to show, by the evidence introduced, that the 528th district was adjacent to the county line sought to be changed, and the evidence rejected was not competent to show that fact.